IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| In the Matter of the Search of:<br>**A gray in color Apple iPhone, cellular telephone, utilized and seized from David A. Sudduth, currently located at the Missouri State Highway Patrol Troop D Headquarters.** | Case No. 23-SW-2023DPR |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Zack Bryan, being first duly sworn, do depose and state that:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.  I am a Task Force Officer (TFO) for the Drug Enforcement Administration (DEA) assigned to the Springfield, Missouri, office, and have been so employed since November of 2022. I have also been employed with the Missouri State Highway Patrol (MSHP) since 2007 and have been a narcotics investigator for the MSHP's Division of Drug and Crime Control since 2016. As a TFO with DEA, I have received training in conducting investigations of violations of federal statutes, including investigative training in the methods and operations used by individuals and organizations that smuggle and transport illegal narcotics. During my time as an TFO with DEA and my experience

1

as a narcotics investigator with the MSHP, I have conducted or participated in numerous investigations of individuals and organizations that smuggle and transport controlled substances.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is a gray in color Apple iPhone, cellular phone, utilized by and seized from David A. Sudduth (hereinafter referred to as the "Device"). The Device is currently located at the MSHP Troop D Headquarters, in Springfield, Greene County, within the Western District of Missouri. A description of the Device, including photographs, is included in Attachment A, which is incorporated by reference herein.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B, which is incorporated by reference herein.

## PROBABLE CAUSE

6. In 2018, MSHP Sergeant James Musche initiated an investigation in the Western District of Missouri involving the distribution of hundreds of pounds of marijuana. The investigation led to the identification of sources of supply for the marijuana and multiple suspects were indicted in the Western District of Missouri.

7. One of the suspects wished to cooperate with the investigation and was documented as a MSHP Confidential Informant (hereinafter referred to as the "CI"). The CI identified his/her source of supply of marijuana during the time of the conspiracy as David Sudduth. The CI stated Sudduth was currently living in Republic, Missouri, and was still involved in distributing large quantities of marijuana. The CI stated he/she communicates with Sudduth on Sudduth's cellular

2

telephone. The CI stated he/she would be able to introduce MSHP Sergeant James Musche to Sudduth, in an undercover capacity, to purchase large amounts of marijuana.

8. On or about January 4, 2023, Sergeant Musche witnessed a call from the CI to Sudduth in which the CI told Sudduth he/she had a friend (Sergeant Musche) wanting to purchase 200 pounds of marijuana. Sudduth agreed to meet Sergeant Musche at a later date.

9. Sergeant Musche met with Sudduth on or about January 12, 2023, in Springfield, Missouri. Sudduth brought two, approximately one-pound bags of marijuana, along with bags that contained smaller samples of marijuana. Sergeant Musche witnessed Sudduth use his cellular telephone to call his source of supply to inquire about the price of the marijuana. Sergeant Musche purchased the marijuana Sudduth brought with him for $1,700.00.

10. On or about January 19, 2023, Sergeant Musche met with Sudduth a second time in Springfield, Missouri, to discuss the purchase of 100 pounds of marijuana. Sudduth stated he would contact his source of supply to get further details and Sergeant Musche observed him texting on his cellular telephone and then received an incoming call. Sudduth asked the caller if he was talking to him on the "right line." Sudduth spoke on his cellular telephone asking how many strains would make up the 100 pounds Sergeant Musche wanted to buy. Sudduth told Sergeant Musche his source of supply would deliver the marijuana to him in garbage bags.

11. Based on my training and experience, as well as conversations with other law enforcement officers with whom I have spoken, and based on Sudduth's question, asking if he was talking to his source of supply on the "right line," it is believed that the source of supply has more than one cellular telephone.

3

12. On or about January 31, 2023, Sergeant Musche witnessed the CI call Sudduth on his cellular telephone. Sudduth agreed to meet Sergeant Musche on February 2, 2023, to deliver the 100 pounds of marijuana for $80,000.00.

13. On or about February 2, 2023, Sergeant Musche witnessed the CI call Sudduth on his cellular telephone. The CI told Sudduth that Sergeant Musche was ready to meet and asked Sudduth to advise him/her of the time and place for the transaction. Sudduth told the CI later that afternoon to meet him at the residence located at 1325 South Prince Lane, Springfield, Missouri.

14. At approximately 18:00 hours, MSHP troopers began surveilling the residence at 1325 South Prince Lane. At approximately 19:00 hours, Sudduth arrived at the residence. At approximately 19:07 hours, a male later identified as Joseph Moore arrived at the residence driving a Ram truck with a camper shell. Surveillance agents observed Sudduth exit the residence and contact Moore near the truck. Sudduth and Moore then walked into the residence together, at that time, Sudduth carried a duffle bag into the residence. The CI arrived at the residence a short time later. Surveillance agents observed Moore back his truck near the garage of the residence and then began to unload items from the bed of the truck into the garage.

15. The CI notified Sergeant Musche that there was approximately 100 pounds of marijuana in the residence. Sergeant Musche then obtained a Greene County, Missouri, Circuit Court search warrant to search the residence. Surveillance agents continued to watch the residence until the MSHP SWAT Team served the search warrant. The only persons present inside the residence were Sudduth, Moore, and the CI. Sergeant Musche located approximately 100 pounds of marijuana inside the residence concealed in a duffle bag and 10 black trash bags located in the garage. The duffle bag also contained a money counter. Law enforcement believe the duffle bag found in the residence to be the same duffle bag that Sudduth carried into the residence upon Moore's arrival, as it was the

only duffle bag located within the residence. Law enforcement searched Sudduth's person and located the Device.

16. Based on my training and experience, I know that people involved in the distribution of drugs utilize their telephones for assistance in the distribution of drugs, and evidence of their distribution can be found on their telephones. Such evidence includes, but is not limited to, names, nicknames, numbers, and addresses for customers and suppliers of drugs.

17. Based upon the foregoing, I believe the Device contains evidence showing that Sudduth has committed violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846.

18. The Device has remained in the custody and care of law enforcement since the time it was seized. It has not been altered and based on my training and experience, the data that it contains should be intact and retrievable. The Device is currently being stored at the MSHP Troop D Headquarters, in Springfield, Greene County, within the Western District of Missouri.

19. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of law enforcement.

20. Additionally, while the Device has been in law enforcement's possession since it was seized, for approximately 34 days, Sudduth has been out of custody for the duration of that time. Neither Sudduth, nor anyone on his behalf, has requested return of the Device. Delay in seeking the requested warrant was brought on by extensive caseloads of the MSHP, DEA, and the United States Attorney's Office, including a separate investigation that resulted in significant time expended conducting surveillance, and writing and reviewing other warrants.

## CELLULAR TELEPHONES

21. Based on my training and experience, I know that drug couriers and traffickers commonly use multiple methods of communication to arrange transactions and conduct business. Cellular telephones, personal computers, and other devices are frequently used to send and receive coded messages over long distances. Drug traffickers commonly maintain financial records reflecting accounting of monies collected and disbursed for the purchase and sale of controlled substances. These records have been discovered written on paper and recorded in digital files on computers, telephones, and other similar devices. Records also may include the transfer of monies involved in the sale and procurement of narcotics. Records may reflect the laundering or concealment of the profits from the sale of the narcotics, as proceeds from narcotics trafficking cannot be legally declared. In my experience, it is common for individuals engaged in illegal narcotics activities to utilize a telephone or computer to prepare and store documents relative to, and in connection with, their illegal activities. These records are typically stored on the device's memory or on external memory devices.

22. Based upon my training and experience, I know that cellular or wireless telephones and their compatible hardware, in conjunction with computer software, are often utilized to store records including, but not limited to, those relating to business activities, criminal activities, names of associates and their addresses, and the identity and location of assets illegally gained through these criminal activities. These records are more fully described as information or data stored in the form of electronic or magnetic coding on cellular telephone and computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, fixed hard drives and removable SIM cards, hard drive cartridges, laser disks, tapes, floppy diskettes, and any other media capable of storing magnetic coding.

23. Based on my training and experience, I know that cellular telephones often contain information that will help identify sources of supply and the intended recipient(s) of the illegal drugs. I know that drug traffickers often refer to other co-conspirators by first name only or by nickname and store such information in the electronic memory of cellular telephones. I know that retrieving names, telephone numbers, and photographs assists in further identifying sources of supply and co-conspirators, who would be difficult or nearly impossible to identify without direct knowledge of these individuals and their drug trafficking organization. I know that traffickers utilize cellular telephones and digital cameras to photograph narcotics and proceeds from the sale of narcotics. I know that drug traffickers photograph themselves with other co-conspirators and many times photograph themselves, and that these photographs can be transferred to computer memories.

24. Based on my training and experience, I know that electronic files can be received, stored, and easily moved from one cellular telephone or electronic storage medium to another. Therefore, electronic files downloaded to, or created on, one cellular telephone can be copied to, or transferred to, any other cellular telephone, at the same location. In addition, based on my experience, I know that searching digitalized information for evidence of crime often requires the assistance of a qualified cellular telephone expert who can accurately retrieve the systems data in a laboratory or other controlled environment. This is true because of the following:

   a. Volume of evidence: Cellular telephone storage devices can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive type file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of the crime. This sorting process can take weeks to months, depending on the volume of data stored.

7

b. Technical requirements: Searching cellular telephone systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Such evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from the destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but are not limited to, surveying various file "directories" and the individual files they contain (which is analogous to looking at the outside of a file cabinet for the pertinent files in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover hidden files; and, performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

8

25. Based on my training and experience, I know that once data is electronically encoded on cellular telephones that the data may remain on the device indefinitely, even after it is deleted using standard methods, in most circumstances.

26. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable

9

storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically

calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

11

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

27. Based upon my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. The Device also has capabilities that allow it to access the Internet. In my training and experience, examining data stored on devices can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

29. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

31. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto any premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

32.     Based on the aforementioned facts herein, I respectfully submit that there is probable cause to believe that the Device, as further described in Attachment A, contains the information further described in Attachment B related to violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, that is conspiracy to distribute, distribution of, and possession with the intent to distribute marijuana, as well as unlawful use of a communications facility. Therefore, I respectfully request this Court issue a warrant to search the Device fully described in Attachment A to search for and seize the items described in Attachment B.

Further your affiant sayeth naught.

_____
Zack Bryan
Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn to before me in my presence via telephone on the ___9th___ day of March, 2023.

_____
HONORABLE JOHN T. MAUGHMER
United States Magistrate Judge
Western District of Missouri

14